# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Maria Correa, et al., | Case No.: 2:16-cv-01852-JAD-NJK |
| Plaintiffs | **Order Granting in Part and Denying in Part Motion for Summary Judgment and Ordering Mandatory Settlement Conference** |
| v. | |
| Las Vegas Metropolitan Police Department, et al., | [ECF No. 44] |
| Defendants | |

This case arises out of the shooting death of Abel Correa by Las Vegas Metropolitan Police Department (LVMPD) officers Glenn Taylor and Eli Prunchak. Discovery is closed and four claims remain to be determined.[1] Abel's mother, Maria Correa, pleads two claims as the administrator of Abel's Estate: (1) excessive force under the Fourth Amendment against Taylor and Prunchak in their individual capacities and (2) personal injury by wrongful act, neglect, or default under Nevada law against LVMPD, Taylor, and Prunchak.[2] Maria pleads one claim as Abel's personal representative—wrongful death under Nevada law against LVMPD, Taylor, and Prunchak. And Maria and Moises Correa, Abel's brother, plead a claim for negligent infliction of emotional distress against LVMPD, Taylor, and Prunchak.

Defendants move for summary judgment on all four claims. They first argue that the Estate's ostensible Fourth Amendment unlawful-entry claim fails because the Estate didn't plead that claim and the officers obtained, at a minimum, implied consent to enter the Correas' home.

---

[1] *Compare* ECF No. 1 (complaint), *with* ECF No. 20 (order granting in part dismissal motion), *and* ECF No. 35 (order granting in part summary-judgment motion).

[2] *See* ECF No. 43 (notice of state court's order granting petition for special letters of administration).

Defendants next argue that Taylor and Prunchak are entitled to qualified immunity on the Estate's excessive-force claim because the evidence, when viewed in a light most favorable to the Estate, demonstrates that each officer's use of deadly force was reasonable under the totality of the circumstances. Defendants contend that they are entitled to summary judgment on the plaintiffs' state-law claims, too, because the Fourth Amendment supplies the reasonableness standard for these claims. Defendants also argue that they are statutorily immune from plaintiffs' state-law claims under NRS 41.032.

The Estate hasn't pled an unlawful-entry claim, so there is nothing to determine on that issue. Taylor and Prunchak have demonstrated that they are entitled to qualified immunity on the Estate's excessive-force claim, but defendants have not demonstrated that the Fourth Amendment's reasonableness standard supplies the breach element for plaintiffs' state-law claims. Nor have defendants shown that they are statutorily immune from those claims. I therefore grant defendants' summary-judgment motion on their qualified-immunity defense, deny the motion in all other respects, and order the parties to a mandatory settlement conference.

## Background[3]

Around 6:15 in the morning of August 7, 2015, Leslie Hildreth called 9-1-1 reporting that his next-door neighbor, Abel Correa, had just thrown a metal trailer-hitch ball through Hildreth's front window and retreated into the Correas' home. Hildreth captured a video of the crime on his home-surveillance equipment. Hildreth told the 9-1-1 operator that he didn't know if Abel had any weapons, but he was known to use methamphetamine. Hildreth called 9-1-1 back an hour

---

[3] Except as otherwise stated, these facts are a summary of what I observed from the footage recorded by Officer Taylor's body-worn camera. ECF No. 44-3 at 28–31.

and a half later reporting that Abel's mother, Maria Correa, whose home it was and who had obtained a temporary protective order against Abel, had returned and was waiting outside.

LVMPD officers Glenn Taylor and Eli Prunchak responded to the calls an hour later. Much of what transpired was recorded by Taylor's body-worn camera. The officers viewed Hildreth's surveillance video, and he told them the same information that he gave to the 9-1-1 operators. The officers then walked next door to the Correas' home where they met Maria, who was seated outside near the front door and speaking in Spanish to someone on her cell phone. The officers asked Maria if they could enter the home. A language barrier prevented clear communication between them, but the officers surmised that Maria didn't have a key. Maria's youngest son, Moises Correa, who also lived in the home, opened the door. The officers asked Moises if they could come in; Moises fully opened the door and the officers entered the home.

Prunchak told Moises to wait by the front door. Taylor stated that "he's been here before" and pointed Prunchak to the location of Abel's bedroom. The officers proceeded in that direction looking for Abel. Taylor can be heard in the video loudly stating "hello" and "come out" and then twice "Metro police" and "come out." Taylor reiterated to his partner that he'd been in the house before and that he "thinks" Abel is "421A." Taylor testified at his deposition that 421A is LVMPD's code for a mentally disturbed person, which could include someone using drugs.[4]

When the officers walked back past the front door, Taylor asked Moises "what were we out here for last time when I showed up?" Moises's response isn't clear in the video. Taylor then asked Moises, "Wasn't [Abel] doing some kinds of drugs, too?" Moises responded "yeah."

---

[4] ECF No. 44-2 at 10 (27:10–24, Taylor).

3

After searching the garage, the officers returned the front door and Prunchak asked Moises if he knew where Abel went. Moises answered "no," but that he had "heard some drilling" earlier.

Moises testified in deposition that while the officers were searching, he looked in the entryway closet and saw Abel standing in it with his back "arched a little bit" and "[a] screwdriver or wrench" was in his hands, which were "down by his side." Abel didn't speak but motioned for Moises to be quiet by putting his finger to his lips. Moises didn't speak and closed the closet door. When Prunchak rounded the corner, Moises motioned to him that Abel was in the closet. Prunchak then instructed Moises to wait outside the home, which he did.[5]

During the exchange between Prunchak and Moises, Taylor checked the kitchen and looked out the patio door. Prunchak can be heard on the video whistling to get Taylor's attention. Taylor turned to Prunchak, who gestured and walked toward the entryway while drawing his gun. Both officers then walked fully into the entryway, which is a narrow space with the front door at the top, a hallway at the bottom, a closet on one side, and a couch backed up to the other side. Both the front and closet doors are hinged to swing in the same direction: the front door swings toward the closet door and the closet door swings toward the kitchen—away from the front door.

Once in the entryway, Prunchak positioned himself next to the front door and facing the closet door. Though not visible on the video—the camera faces away from the closet door at this point—both officers testified in deposition that Taylor opened the closet door with his right hand; his gun was drawn in his left hand, which is his dominant one.[6] The movement in the video is consistent with the officers' testimony.

---

[5] *Id.* at 50 (30:11–35:12, Moises).

[6] *Id.* at 11 (31:23–33:01, Taylor), 35 (51:04–08, Prunchak).

4

What transpired after Taylor opened the closet door happened in the space of a few seconds, so it is necessary to view the video at slow speed, which I did. Prunchak stated "get your hands up" and backed up a couple feet until he reached the couch. Taylor backed away from the closet and toward the hallway. Both officers then fired their guns.[7] When Abel is first visible in the video, he's in the doorway of the closet, facing Prunchak, who has backed into the couch, and Abel's left hand is raised to his shoulder. The state of Abel's left hand—whether it is fisted, bladed, or he's holding onto something—and his entire right side are not visible on the video. When Abel falls to the floor after being shot, a screwdriver can be seen spinning on the floor next to him.

Taylor testified that after he opened the closet door and looked up, he perceived that Abel had "a chrome six-inch bladed knife in his right hand." Taylor then stood back, and as he did, Abel "lunged out at [Taylor's] partner." Taylor then shot twice, heard an echo, fell back further to the hallway, and looked back and saw that Prunchak was ok and Abel was falling to the ground.[8] Prunchak testified that when Taylor opened the door, he saw Abel standing with a large screwdriver in his right hand and a large wrench in his left one, both hands raised against his head in what Prunchak calls "a fighting stance." Prunchak fired when he saw Abel's "right foot come up to step out of the closet toward" him.[9] A screwdriver and wrench were found near or under Abel's body after the shooting.[10] Neither Moises[11] nor Maria[12] witnessed the shooting.

---

[7] At this point the video is partially obscured by what appears to be Officer Taylor's lapel.
[8] ECF No. 44-2 at 11 (32:17–33:01, Taylor).
[9] *Id.* at 37 (58:20–59:05, Prunchak).
[10] ECF No. 44-3 at 46 & 45 ¶ 10.
[11] ECF No. 44-2 at 51 (35:10–36:02, Moises), 53 (41:06–10, Moises).
[12] *Id.* at 65 (36:04–25, Maria).

But Maria witnessed Abel falling to the ground after the officers shot him and she testified that Abel had a screwdriver in his hand.[13]

**Summary-judgment standard**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[1] When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[2] If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[3]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[4] "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."[5]

**Discussion**

**A.    The Estate hasn't pled a Fourth Amendment unlawful-entry claim.**

Defendants argue that the Estate's Fourth Amendment unlawful-entry claim fails for two reasons: (1) the Estate hasn't pled that claim for relief and (2) the officers had, at a minimum,

---

[13] *Id.*

[1] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R. CIV. P. 56(c)).

[2] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[3] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[5] *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).

implied consent to enter the Correas' home. None of the claims for relief in the complaint expressly allege—or can reasonably be construed to allege—that the officers' entry into the Correas' home was unlawful under the Fourth Amendment. Though plaintiffs don't directly address this argument in their response to the summary-judgment motion, they implicitly acknowledge that the Estate hasn't pled this claim by excluding it from their recitation of the claims that remain to be determined.[14] I find that the Estate hasn't pled a Fourth Amendment unlawful-entry claim, so I deny defendants' motion for summary judgment on that phantom claim.

**B.     Defendants are entitled to qualified immunity on the Estate's excessive-force claim.**

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[15] When deciding if a government official is entitled to qualified immunity, courts ask whether (1) the facts that plaintiff has alleged or shown "make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct."[16] The plaintiff bears the burden of demonstrating that both prongs are met.[17] Courts "have discretion to choose which qualified-immunity prong to address first" and, depending on the conclusion reached for the first-analyzed prong, "need not address the other."[18]

---

[14] *See* ECF No. 45 at 6–7.
[15] *White v. Pauly*, ___ U.S. ___, ____, 137 S. Ct. 548, 551 (2017) (quotation omitted).
[16] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).
[17] *Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 946 (9th Cir. 2017).
[18] *Id.* (citing *Pearson*, 555 U.S. at 236 (departing from the mandate in *Saucier v. Katz*, 533 U.S. 194, 207 (2001), that the first question must be resolved first)).

7

I begin with the first prong, and because I conclude that the facts shown do not make out a violation of a constitutional right, I do not address the second prong.

An excessive-force claim brought by a suspect or arrestee "is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons against unreasonable seizures of the person."[19] "The operative question in excessive-force cases is 'whether the totality of circumstances justifies a particular sort of search or seizure.'"[20] "Excessive force claims are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."[21]

Courts in the Ninth Circuit "approach an excessive[-]force claim in three stages."[22] First, the court "assess[es] the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted."[23] Then the court "evaluate[s] the government's interests by assessing the severity of the crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape."[24] Finally, the court "balance[s] the gravity of the intrusion on the individual against the government's need for that intrusion."[25]

Applying these standards here, I conclude that Taylor's and Prunchak's use of force was not objectively unreasonable. The level and amount of force they used was the highest

---

[19] *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quotation and ellipses omitted).

[20] *County of Los Angeles v. Mendez*, ___ U.S. ___, ___ 137 S. Ct. 1539, 1546 (2017) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

[21] *Id.* at 1546–47 (ellipses omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 207 (2001)).

[22] *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).

[23] *Id.* (quoting *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)).

[24] *Id.*

[25] *Id.* (quoting *Espinosa*, 598 F.3d at 537).

available—Abel died from multiple gunshots fired by both officers. As for the government's interests, although I must at summary judgment review the evidence in a light most favorable to the Estate, its theory of what happened is largely speculation and not supported by any evidence. The Estate contends that when Taylor and Prunchak shot and killed Abel, he was suffering from mental illness, "frightened[,]" and "cower[ing] in his mother's closet, a space he often retreated to when stressed to 'fix' things[,]" and that the officers perceived Abel was a threat only because he was "surrounded by tools . . . ."[26]

The evidence shows that the following facts were knowable by the officers when they entered and searched the Correas' home on August 7, 2015. Abel, apropos of nothing, had thrown a metal trailer-hitch ball through his neighbor's front window early that morning and retreated into the Correas' home. Abel was known to use methamphetamine; Taylor had previously responded to a call at the home that concerned Abel and his suspected drug use. Abel's mother possibly had obtained a protective order against Abel. And though he hadn't recently seen his brother in the home, Moises did hear Abel "drilling" before the officers arrived.

As for the shooting itself, the evidence shows that despite Taylor loudly stating multiple times "Metro police" and "come out," Abel hid from the officers in the entryway closet and armed himself with a screwdriver. When Taylor opened the closet door, Abel was standing, but slightly hunched and holding a screwdriver in one hand.[27] Finally, when the officers shot him, Abel was not cowering within the closet but had partially exited it and was facing Prunchak with his hands raised and holding a screwdriver in one hand.

---

[26] ECF No. 45.

[27] This is precisely how Moises testified Abel was positioned when Moises had opened the closet door moments before.

9

Thus, the facts show that, at the time of the shooting, Abel elevated the severity of the crime at issue from low to high: from misdemeanor vandalism to assault on a police officer. The facts also show that Abel was refusing to obey the officers' commands and posed an immediate threat to Prunchak's safety. Abel armed himself with a screwdriver and hid in a closet from the officers. When Taylor opened the closet door, Abel neither remained in place nor dropped his hands as Prunchak instructed but moved out of the closet toward Prunchak—who was within a few feet and whose further retreat was blocked by a couch—with raised hands and holding a screwdriver.

Under the totality of these circumstances, neither Taylor's action of using deadly force to protect his partner from the threat that Abel posed nor Prunchak's action of using deadly force to protect himself from that same threat was excessive when balanced against the government's need for such force. Defendants have demonstrated that Taylor and Prunchak are entitled to qualified immunity as a matter of law on the Estate's excessive-force claim, so I grant their summary-judgment motion on this issue.

**C.      Defendants' motion on the breach element of plaintiffs' state-law claims is denied.**

Defendants argue that they are entitled to summary judgment on all three of plaintiffs' state-law claims because each claim requires that plaintiffs prove that the officers acted unreasonably. They further contend that the Fourth Amendment's reasonableness standard supplies the breach element for these claims, so a finding that the officers are entitled to qualified

immunity, i.e., didn't act unreasonably under the circumstances, means there was no breach of duty.[28] Plaintiffs don't meaningfully address any part of defendants' argument.[29]

Defendants' first point is logically sound because each claim is, at a minimum, premised on the negligent conduct of the officers,[30] so whether the officers breached a duty of care that they owed with respect to Abel is a common thread that runs through each claim.[31] But defendants' argument falls apart at their next point, that "[i]t is well established that a state law excessive force claim is analyzed under the reasonableness standard of the Fourth Amendment."[32] First, plaintiffs' state-law claims are not excessive-force claims, which are typically common-law assault and battery claims,[33] but claims for wrongful death, personal injuries by wrongful or neglectful act, and negligent infliction of emotional distress. Second, defendants don't provide—or analyze—any Nevada law to support their lynchpin argument that under Nevada law, an officer's breach of duty in a negligence-type claim is analyzed under the

---

[28] ECF No. 44 at 28–29.

[29] *See* ECF No. 45 at 18 (arguing merely that "Plaintiff has established that Defendants' use of force was unreasonable, so to whatever extent Plaintiff's claims rest on the reasonability of force, Plaintiff's claims withstand").

[30] Nev. Rev. Stat. §§ 41.085(2) (authorizing heirs and personal representatives to maintain an action for damages against the persons whose "wrongful act or neglect" causes the death of another), 41.130 (authorizing any person who suffers a personal injury by the "wrongful act, neglect, or default of another" to maintain an action for damages against that person); *Nelson v. City of Las Vegas*, 665 P.2d 1141, 1146, n.4 (Nev. 1983) (explaining that "the basis of [plaintiff's] recovery [on an NIED claim] would be the defendant's liability in negligence").

[31] *See, e.g.*, *Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1175 (Nev. 2008) (explaining that "[a] claim for negligence in Nevada requires that the plaintiff satisfy four elements: (1) an existing duty of care, (2) breach, (3) legal causation, and (4) damages").

[32] ECF No. 44 at 29.

[33] *See, e.g.*, *Ramirez v. City of Reno*, 925 F. Supp. 681 (D. Nev. 1996) (concluding that "Nevada's courts would adhere to . . . the general rule" espoused by the law of its neighbors that "[p]olice officers are privileged to use that amount of force which reasonably appears necessary, and are liable for battery to the extent they use more force than is reasonably necessary.").

Fourth Amendment's reasonableness standard. Defendants cite *Belch v. Las Vegas Metropolitan Police Department*, which though a decision from a federal court sitting in Nevada, looked to California law and a Ninth Circuit case applying Washington law for the proposition that the Fourth Amendment's reasonableness standard supplies the breach element for state-law negligence claims against officers.[34] But the Ninth Circuit recently explained in *Vos v. City of Newport Beach* that, "[t]o determine police liability" under California law, "a court applies tort law's 'reasonable care' standard, which is distinct from the Fourth Amendment's 'reasonableness' standard."[35] The 18 lines that defendants devote to this argument don't establish that the breach component of plaintiffs' state-law claims is governed by the Fourth Amendment's reasonableness standard, so defendants' motion is denied on this ground.

**D.     Defendants are not statutorily immune from plaintiffs' state-law claims.**

Finally, defendants argue that they are statutorily immune from plaintiffs' state-law claims under NRS 41.032. As I explained when I rejected this argument in deciding defendants' first summary-judgment motion, since the Nevada Supreme Court adopted the U.S. Supreme Court's *Berkovitz-Gaubert*[36] test to determine whether a state official's actions are protected by discretionary immunity, "federal courts applying Nevada law have been reluctant to grant discretionary immunity to police officers accused of using excessive force" because an officer's

---

[34] *Belch v. Las Vegas Metro. Police Dep't*, 2012 WL 4610803 (D. Nev. Sept. 30, 2012).

[35] *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037–38 (9th Cir. 2018) (quoting *Hayes v. County of San Diego*, 305 P.3d 252 (Cal. 2013)).

[36] *Berkovitz v. United States*, 486 U.S. 531 (1988); *United States v. Gaubert*, 499 U.S. 315 (1991).

decisions regarding "the amount of force to use are not the kind of decisions the discretionary function exception was designed to shield."[37]

Defendants "acknowledge" that I agreed with the courts that have held that discretionary-function immunity does not protect use-of-force decisions.[38] But they nonetheless point me to *Jones v. Las Vegas Metropolitan Police Department*, a case in which they contend the Ninth Circuit has interpreted Nevada's discretionary-immunity statute to shield police use-of-force decisions "except for those 'decisions made in bad faith, such as "abusive" conduct resulting from "hostility" or "willful or deliberate disregard" for a citizen's rights.'"[39] But *Jones* doesn't address the fact that Nevada adopted the *Berkovitz-Gaubert* test, nor does it apply that test. This likely occurred because *Jones* relies on *Davis v. City of Las Vegas*[40] for its statement about Nevada's law on this subject and *Davis*, in turn, relies on two cases that were abrogated by the Nevada Supreme Court when it adopted the *Berkovitz-Gaubert* test.[41] So, *Jones* cannot be construed as interpreting Nevada law to shield all use-of-force decisions except when made in bad faith. Defendants' only other authority for this point, *Scafidi v. Las Vegas Metropolitan Police Department*, is nonbinding and materially distinguishable because it doesn't involve an

---

[37] ECF No. 35 at 3–5 (quoting *Plank v. Las Vegas Metro. Police Dep't*, 2016 WL 1048892, at *8 (D. Nev. Mar. 14, 2016); *Huff v. N. Las Vegas Police Dep't*, 2013 WL 6839421, at *10 (D. Nev. Dec. 23, 2013)).

[38] ECF No. 44 at 29.

[39] *Id.* (quoting *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1133 (9th Cir. 2017)).

[40] *Jones*, 873 F.3d at 1133 (citing *Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir. 2007)).

[41] *Compare Davis*, 478 F.3d at 1059 (citing *Maturi v. Las Vegas Metro. Police Dep't*, 871 P.2d 932 (Nev. 1994); *Ortega v. Reyna*, 953 P.2d 18 (Nev. 1998)), *with Martinez v. Maruszczak*, 168 P.3d 720, 727–29 (Nev. 2007) (explaining what the test was under *Martinez* and *Ortega*, "tak[ing] this opportunity to clarify the test for evaluating claims of discretionary-function immunity under NRS 41.032(2)[,]" and "adopt[ing] the *Berkovitz-Gaubert* approach").

officer's decision to use force but, rather, the decision to arrest.[42] Defendants have failed to demonstrate that my prior decision denying defendants' first motion for summary judgment on their discretionary-function immunity defense merits reconsideration,[43] and I deny their summary-judgment motion on this ground, too.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that defendants' motion for summary judgment **[ECF No. 44] is GRANTED in part:** defendants are entitled to qualified immunity from the Estate's Fourth Amendment excessive-force claim. The motion is **DENIED** in all other respects.

IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for a mandatory settlement conference.** The parties' obligation to file their joint pretrial order is **STAYED** until 10 days after that settlement conference.

Finally, defendants provided my chambers with a courtesy copy of the footage from Taylor's body-worn camera on a DVD and courtesy copies of the audio recordings of the 9-1-1 calls and LVMPD's dispatch recordings for the event on another DVD, but they failed to manually file either DVD with the Clerk's office. So, the **Clerk of Court is directed to manually file** in this case the courtesy-copy DVDs that defendants provided my chambers, which I will give to the Clerk's office for that purpose.

Dated: April 15, 2019

_____
U.S. District Judge Jennifer A. Dorsey

---

[42] *Scafidi v. Las Vegas Metro. Police Dep't*, 2018 WL 2123372 (D. Nev. May 8, 2018).

[43] *See* LR 59-1 (party seeking reconsideration of interlocutory orders must "state with particularity the points of law or fact that the court has overlooked or misunderstood" or "changes in legal or factual circumstances that may entitle the movant to relief").